**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DANIEL G.,[1]<br><br>Plaintiff,<br><br>v.<br><br>FRANK BISIGNANO,<br>Commissioner of Social Security,<br><br>Defendant. | NO. 1:25-CV-07184<br><br>Judge Edmond E. Chang |

**MEMORANDUM OPINION AND ORDER**

Daniel G. brought this action seeking review of the Social Security Commissioner's denial of his disability-benefits application.[2] R. 1, Compl. ¶¶ 4–7.[3] An Administrative Law Judge (commonly called an ALJ) determined that Daniel was not disabled from March 2021 to December 2022 because he still had the ability to work certain jobs. R. 9-1, Admin. Record Vol. 1 (AR1) at 11–28.[4] Daniel contends that the ALJ erred and benefits should be awarded, R. 16, Pl.'s Br., while the government seeks

[1]Consistent with this district's internal operating procedures, the Court refers to the Plaintiff only by his "full first name and the first initial of the last name." N.D. Ill. Internal Op. P. 22. But for consistency with *Mitze v. Saul*, 968 F.3d 689, 692–93 (7th Cir. 2020), the Plaintiff must file a motion to maintain pseudonym by October 14, 2026, explaining why the Opinion should not be amended to include his full name.

[2]This Court has subject matter jurisdiction over this case under 42 U.S.C. §§ 405(g), 1383(c)(3).

[3]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

[4]Citations to either volume of the Administrative Record refer to the page numbers in the bottom-right corner.

affirmance, R. 19, Def.'s Mot. For the reasons explained in this Opinion, the ALJ's analysis is supported by substantial evidence so the denial of benefits is affirmed.

## I. Background

Daniel first applied for disability benefits in January 2022. AR1 at 177. In the application, Daniel alleged a disability-onset date of March 31, 2021. *Id.* The application was initially denied in September 2022 and denied again on reconsideration in June 2023. *Id.* at 86, 96. Daniel then requested a hearing in front of an ALJ, *see id.* at 118, and the hearing was held in January 2024, *id.* at 38, 40. At the hearing, Daniel reported that he had begun working again in December 2022, so the ALJ focused on the period of time between March 31, 2021 and December 5, 2022. *Id.* at 44. After the hearing, the ALJ issued an opinion finding that Daniel was not disabled because he was able to do some types of work that are available in the national economy. *Id.* at 18–28. The Appeals Council for the Social Security Administration denied Daniel's request to review the ALJ's decision, R. 1-1, Appeals Council Notice, so the ALJ's ruling became the final decision of the Commissioner, 20 C.F.R. §§ 404.955(b), 404.981. Daniel timely sought review of the ALJ's decision. *See* Compl.

### A. Factual Background

The Administrative Record supplies the factual background of this case. At the time of the ALJ hearing, Daniel was 56 years old and had a high school education. AR1 at 177, 224. Daniel had worked for over 20 years in information technology (commonly known as IT) before leaving his job as a Senior Network Engineer for the U.S.

Military Entrance Processing Command in March 2021 because of his depression and anxiety. *Id.* at 223, 239–44.

Daniel's medical records show that he had a history of depression for around 30 years before quitting his job in 2021. AR1 at 466, 548, 562. In the year before he stopped working, Daniel reported symptoms of depression to his healthcare providers. *Id.* at 587–96. In April 2020, Daniel told a healthcare provider during a telehealth appointment that he was experiencing a "depressed mood, irritability, [and] poor frustration tolerance." *Id.* at 588. And in October and November 2020, he reported "decreased energy, hopelessness, anhedonia, irritability, and decreased ability to concentrate with work," and "cloudy thinking." *Id.* at 592, 595. During an appointment in February 2021, Daniel reported "continued memory problems" and "difficulty thinking." *Id.* at 599.

In June 2021, Daniel sought treatment for depression at AMITA Health Saint Joseph Hospital, where he saw Dr. Fabian Carbonell. *Id.* at 54, 354. Dr. Carbonell admitted Daniel to an intensive outpatient program for group therapy sessions three times a week, which Daniel completed in August 2021. *Id.* at 356, 455. After that, Daniel reported improvement in his anxiety and depression. *Id.* at 536. He also reported a decrease in the frequency of panic attacks. *Id.*

But Daniel continued to seek treatment for his anxiety and depression after completing the outpatient program. In August 2021, he began seeing a neurologist, Dr. Jonathan Vogel, for anxiety and depression. AR1 at 562. Daniel told Dr. Vogel that he regularly played golf and the drums, though memory issues had affected his

ability to do both. *Id.* In October 2021, Daniel reported suffering from "broad cognitive problems" with attention, memory, planning and organization, task completion, mental slowness, and thinking clarity and efficiency. *Id.* at 547. At that time, Daniel reported feeling like he could not return to work due to those cognitive difficulties. *Id.* In December 2021, Daniel began receiving individual counseling. *Id.* at 914. In those sessions, he reported struggling with memory, confusion, apathy, and frustration. *Id.* at 909, 911, 914. But Daniel also discussed his enjoyment of playing golf and playing the drums. *Id.* at 887, 890–92, 898, 900, 907, 909, 912. Daniel concluded the counseling sessions in June 2022. *Id.* at 886.

In September 2022, Dr. Howard Tin conducted a consultative examination of Daniel on behalf of the Bureau of Disability Services, a state agency. AR1 at 81, 86; *see also Heckler v. Day*, 467 U.S. 104, 106–07 (1984) (outlining disability-claim process). At this examination, Daniel reported problems with completing chores, getting lost while driving, ignoring his bills, struggles engaging in his hobbies, and difficulty completing tasks. AR1 at 82. Although Dr. Tin observed that Daniel had a "sad mood" and "monotone speech," the doctor found that Daniel had experienced moderate improvement since he was admitted to AMITA Health Saint Joseph Hospital in June 2021. *Id.* Dr. Tin also found that Daniel's judgment and memory were intact. *Id.* Based on these observations, Dr. Tin did not find Daniel's allegation of the severity of his depression and anxiety to be consistent with his ability to function well day to day. *Id.* at 84.

Daniel disagreed with Dr. Tin's findings and sought reconsideration of his disability determination in November 2022. AR1 at 113. The psychiatric examination at the reconsideration stage was completed in June 2023 by Dr. Michael Schneider. *Id.* at 92, 95. Dr. Schneider found that Daniel's attention and concentration appeared intact, and that his cognitive abilities were "grossly intact." *Id.* at 93, 95. But Dr. Schneider did acknowledge that the test results suggested that Daniel "would need some support to remember and organize his work tasks," and that Daniel "would need a low pressure work setting with flexible hours in order to complete work tasks." *Id.* at 94. Ultimately, Dr. Schneider found that Daniel "is mentally able to perform semi-skilled tasks in a low pressure/low stress work setting that allows for flexible hours and does not require working closely with others." *Id.* at 95.

Between his appointments with Dr. Tin and Dr. Schneider, Daniel returned to work in a non-technical position with the cybersecurity division at his former employer in December 2022.[5] AR1 at 43–45, 46, 47. At the hearing with the ALJ, Daniel testified that he is able to perform his job because his boss allows him to take notes and helps him go over things when he forgets or cannot understand his own notes. *Id.* at 46.

**B. Disability-Determination Process**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or

[5]During the hearing, Daniel confirmed that he was requesting a closed period of disability that ended when he was hired for his current job. AR1 at 44.

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations prescribe a five-part sequential test for determining whether a claimant is disabled. See 20 C.F.R. § 404.1520(a)(4). The test requires the Commissioner to consider in sequence: (1) whether the claimant has performed any substantial gainful activity during the period for which he claims disability; (2) if he has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe and of such duration as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual functional capacity (RFC) to perform his past relevant work; and (5) if the claimant cannot perform his past relevant work, whether he is able to perform any other work existing in significant numbers in the national economy. *Id.* §§ 404.1520(a)(4), (g), 404.1560(c); *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001).

If the answer to Steps 1 or 2 is "no"—that is, the claimant performed substantial gainful activity or lacks a severe impairment—then the Commissioner will reach a finding of "not disabled." *See Zurawski*, 245 F.3d at 886. Otherwise, the Commissioner moves on to Step 3—that is, whether the severe impairment is on an automatically qualifying list or (if not) precludes substantial gainful activity. At Step 3, if the claimant's impairment is listed as one that automatically precludes substantial

gainful activity, then the claimant is found to be disabled. *Id.* If not, then the Commissioner must determine the extent of the claimant's residual functioning capacity—that is, the sort of work that the claimant can still perform given his impairment—and assess whether that capacity allows the claimant to perform either his past work (Step 4) or any other work existing in significant numbers in the national economy (Step 5). *Id.* If the claimant's capacity falls short of those, then the claimant is deemed to be disabled. *Id.* The claimant bears the burden of proof at Steps 1 through 4. 20 C.F.R. § 404.1560(c)(2); *Zurawski*, 245 F.3d at 886. After that, it is up to the Commissioner to establish that the claimant is capable of performing work that exists in significant number in the national economy. *Zurawski*, 245 F.3d at 886.

**C. The Administrative Process**

As previewed earlier, Daniel's disability-benefits application was first considered by two state-agency physicians who reviewed his medical file. In September 2022, the first state-agency physician, Dr. Tin, concluded that even though Daniel's impairments could explain the intensity, persistence, and functionally limiting effects of his symptoms, Daniel's statements about his symptoms were only partially consistent with the objective evidence. AR1 at 84. Dr. Tin did not assess Daniel's RFC, *see id.* at 84–85, but found that Daniel was not disabled and that he could perform at least three jobs that exist in the national economy in significant numbers, *see id.* at 85–86. Daniel requested reconsideration of that decision, *see Kaplarevic v. Saul*, 3 F.4th 940, 942 (7th Cir. 2021) (citing 20 C.F.R. § 404.1503); 20 C.F.R. § 404.907, so in June 2023 a second state-agency physician, Dr. Schneider, reviewed his application

and any new evidence, AR1 at 88–96. Dr. Schneider noted that Daniel did not report worsening or changes in his symptoms, and that Daniel's statements about the intensity, persistence, and functionally limiting effects of his symptoms were *not* substantiated by the objective medical evidence alone. AR1 at 92–93. Dr. Schneider went on to assess Daniel's RFC, and found that Daniel was not disabled and was mentally able to perform semi-skilled tasks in a low-pressure work environment that allows flexible hours and does not require him to work closely with others. *Id.* at 94–95.

Daniel then sought review by an ALJ. At the January 2024 hearing, Daniel testified about how in the last six months before he quit, he struggled to remember how to do tasks he used to be able to do. AR1 at 51–54. Daniel told the ALJ that between March and June 2021, before he went to the hospital, his "functions were gone." *Id.* at 55. Daniel claimed that in those months, he could not talk, could not get out of bed, did not eat, and could not understand Chinese—which his spouse uses to communicate with him. *Id.* He also claimed that he lost the ability to do things like play pool and the drums because his mind and body did not work together. *Id.* at 55–56, 59. With regard to applying for and starting the new job in December 2022, Daniel testified that he put forth a lot of effort to function in a way that would allow him to work again. *Id.* at 63. He represented to the ALJ that his functioning was better than what it was when he quit his previous job in March 2021. *Id.*

The vocational expert, Tobey Andre, also testified at the hearing. AR1 at 66. The ALJ asked Andre about jobs in the national economy that were at the sedentary level that someone of Daniel's age, education, and experience could perform. *Id.* at

66–67. The ALJ also added some limitations that, in her view, accounted for Daniel's mental limitations. *Id.* at 67. Andre then provided a set of jobs that existed in significant numbers in the national economy, and discussed how the ALJ's limitations affected someone's ability to perform those jobs. *Id.* at 68–77. Daniel's lawyer then asked Andre a question about how someone's need for flexible hours would affect the availability of work. *Id.* at 77. Andre testified that no flexible-hours accommodation would be possible for an unskilled position. *Id.*

The ALJ issued a written decision denying the benefits application. At Step 1, the ALJ determined that Daniel engaged in substantial gainful activity between December 2022 and January 2024, but did not engage in substantial gainful activity between March 31, 2021, and December 5, 2022. *See* AR1 at 14–15. At Step 2, the ALJ concluded that Daniel had several severe impairments: major depressive disorder, persistent depressive disorder, and anxiety disorder.[6] *Id.* at 15–16. At Step 3, the ALJ found that Daniel's combination of impairments did not match an impairment listed in the regulations as precluding any possible gainful activity. *Id.* at 17–18. At Step 4, the ALJ determined that Daniel could not perform his past work. *Id.* at 25–26.

[6]The ALJ also determined that Daniel had several non-severe impairments—hypertension, high cholesterol, diabetes, sleep apnea, a history of COVID-19, and obesity. AR1 at 16. The ALJ also concluded that Daniel's allegations about "handing, fingering, and reaching problems" did not constitute a medically determinable impairment because subjective allegations are insufficient to prove that such an impairment exists. *Id.* Because these conditions are not important to the core dispute in this case, there is no need to detail them further.

Finally, at Step 5, the ALJ concluded that Daniel has the RFC—that is, the ability to do work despite his severe impairments—to perform a full range of work at all exertional levels. AR1 at 18. The ALJ imposed a range of non-exertional limitations:

> [1] Understand, remember, and carry out simple work instructions; [2] able to sustain the necessary attention and concentration in two hour increments throughout the day to sustain simple job duties assuming typical workday breaks; [3] make simple work-related decisions; [4] respond appropriately to supervision, work occasional interaction with co-workers and the general public; [5] tolerate the usual work situations in a routine work setting; [6] is able to deal with occasional changes; and [7] should not perform fast-paced production work or work with strict production quotas but work with … end of day goals.

*Id.* at 18. The ALJ arrived at this assessment consistently with the state-agency physicians' reasoning, concluding that Daniel's "statements concerning the intensity, persistence and limiting effects" of his symptoms were not "entirely consistent" with the medical evidence and other evidence in the record. *Id.* at 20. The ALJ acknowledged that Daniel's test results demonstrated deficits in certain areas, like "low average delayed recall, 'mildly reduced' memory and verbal learning, and deficient impulse control," but adopted the state-agency physicians' opinion that Daniel did not have a true neurocognitive disorder. *Id.* Rather, the ALJ pointed out that the state-agency physicians' opinion was that Daniel "was experiencing cognition-affecting symptoms that were being caused by depression and/or … by [a] combination of anxiety and situational stress." *Id.* The ALJ stated that this conclusion was supported by factors like Daniel's brain imaging study results, which were normal. *Id.*

The ALJ did find that the record contained evidence that Daniel's depression caused similar symptoms as a neurocognitive disorder—even if Daniel did not have one—and thus warranted restrictions on task complexity due to evidence of cognition-related deficits in areas such as memory and reasoning. AR1 at 21. But overall, the ALJ found that record "is consistent with [Daniel] having fewer long-term symptoms and limitations than what was specifically alleged." *Id.* For instance, the ALJ cited 2021 mental-test results of normal memory and attention, that Daniel was "objectively unremarkable in areas like thought processes, appearances, alertness, memory … and behavior," and Daniel's normal levels of alertness, affect, and speech. *Id.* at 21–22. The ALJ also discussed evidence showing that Daniel was engaging in various activities despite his impairments, such as golf, drumming, pool, driving a car for hours at a time on a regular basis, managing his personal finances, going on job interviews, and using a foreign language. *Id.* at 22. The ALJ found evidence that Daniel's participation in these activities "involve[d] several of the same functional abilities as the disability allegations." *Id.* Finally, the ALJ noted that Daniel's treatment history was not "entirely consistent" with his allegations because the record did not show regular and consistent inpatient or outpatient treatment after the alleged onset date. *Id.* at 22–23. Specifically, she found that though this history was not inconsistent with "severity," it demonstrated that Daniel had a better RFC that what was alleged. *Id.* at 23.

Based on Daniel's functioning capacity, the ALJ found that there were jobs that Daniel could perform. AR1 at 26–27. Remember that at this stage, the burden of

proof shifts to the government to establish that there are significant numbers of jobs in the national economy that Daniel would be able to do. 20 C.F.R. § 404.1560(c); *Zurawski*, 245 F.3d at 886. Relying on the vocational expert's testimony, the ALJ determined that, even with his limitations, Daniel could work as a scrap sorter (DOT 509.686-018); packager (DOT 920.587-018); and laundry worker (DOT 361.684-014).[7] AR1 at 27.

## II. Legal Standard

The Social Security Act provides for limited judicial review of a final decision of the Commissioner. 42 U.S.C. § 405(g). The Appeals Council's decision not to review an ALJ's ruling constitutes a final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009). A decision must be reversed if the Commissioner committed an error of law or if the record as a whole does not contain substantial evidence to support the Commissioner's findings. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). If there is an error of law, then reversal is warranted, no matter how much evidence supports the final determination. *Schmoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980). A decision contains an error of law when it fails to comply with the Commissioner's regulations. *See Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir.

[7]The ALJ noted that though the vocational expert's testimony is inconsistent with the information contained in the Dictionary of Occupational Titles (DOT), the RFC is tailored to this particular claimant and some of the RFC variables are not in the DOT (like occasional interaction with coworkers and the general public, occasional changes, and the idea of work pace). AR1 at 27.

2009) (reversing decision that did not comply with regulation concerning weight given to treating physician's opinion).

Although this Court reviews the ALJ's legal decisions *de novo*, the ALJ's factual determinations are granted deference and must be affirmed so long as they are supported by substantial evidence on the record. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Evidence is "substantial" if a reasonable person would accept it as adequate to support the ALJ's decision. *Id.* "Although this standard is generous, it is not entirely uncritical," and the case must be remanded if the decision lacks evidentiary support. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When evaluating a disability claim, the ALJ must consider all relevant evidence and may not select and discuss only the evidence that favors the ALJ's ultimate conclusion. *See Murphy v. Astrue*, 496 F.3d 630, 634–35 (7th Cir. 2007); *see also Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994) ("Our cases consistently recognize that meaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence." (collecting cases)). Although the ALJ is not required to discuss every piece of evidence in the record, the ALJ "must provide a logical bridge between the evidence and the conclusions so that [the Court] can assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial

review." *Jones*, 623 F.3d at 1160 (cleaned up).[8] "If the Commissioner's decision lacks adequate discussion of the issues, it will be remanded." *Villano*, 556 F.3d at 562.

## III. Analysis

Daniel raises two objections to the ALJ's finding on residual functioning capacity. He insists that (1) the ALJ's assessment of his RFC was not supported by substantial evidence because the ALJ failed to include limits assessed by the state-agency physician, which the ALJ found persuasive, allegedly without explanation for the omission; and (2) the ALJ's analysis of the opinions of the neuropsychological examiner, Dr. Jason Soble, was not supported by substantial evidence because she mischaracterized Dr. Soble's opinions, failed to explain inconsistencies between the opinions and evidence, and failed to assess whether other evidence was consistent and supported by those opinions. Pl.'s Br. at 2–14. The government argues that the ALJ relied on substantial evidence. Def.'s Mot. at 2–11. As explained below, on review of the record, the ALJ's assessment on functioning capacity is adequately supported by substantial evidence.

### A. Dr. Schneider

First up is Daniel's argument that the ALJ ignored the limits set forth by Dr. Schneider. Dr. Schneider opined that Daniel had moderate limits understanding, remembering, or applying information; interacting with others; and concentrating,

[8]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

persisting, or maintaining pace. S*ee* AR1 at 91. Daniel contends that Dr. Schneider recommended that Daniel should receive support to remember and organize work tasks in a low-pressure work setting with flexible hours. Pl.'s Br. at 3; AR1 at 95. In Daniel's view, the ALJ erred when those limits were supposedly not included in the assessment of residual functioning capacity. Pl.'s Br. at 3.

As a threshold matter, "nothing requires the ALJ to adopt each and every limitation opined by a physician, even when she finds the opinion persuasive." *Jack A. v. Kijakazi*, 2021 WL 5882145, at *3 (N.D. Ill. Dec. 13, 2021) (citing *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007)). In assessing Daniel's RFC, the ALJ adequately accounted for the limitations assessed by Dr. Schneider, and was not required to adopt them wholesale. Instead, the ALJ's analysis of a claimant's RFC need only "say enough to enable a review of whether the ALJ considered the totality of a claimant's limitations." *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021). Here, that standard is satisfied: in the findings, the ALJ concluded that Daniel was able to perform work between March 2021 and December 2022, but *with certain limitations*:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations … [u]understand, remember, and carry out simple work instructions … respond appropriately to supervision … work occasional interaction with co-workers and the general public … and should not perform fast-paced production work or work with strict production quotas but work with … end of day goals.

AR1 at 18. The ALJ explained that this finding was based on "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the

objective medical evidence and other evidence," based on the requirements in 20 C.F.R. § 404.1529 and 20 C.F.R. § 404.1520c. *Id.* at 19. What follows next explains why the ALJ's limitation findings are supported by substantial evidence.

***Flexible hours.*** The ALJ's finding that Daniel should not perform fast-paced production work but could work with end-of-day goals is supported by substantial evidence. The ALJ adequately explained why Dr. Schneider's recommendations to the contrary are not convincing after considering the record as a whole. AR1 at 12, 14, 19. As an initial matter, the ALJ found that Dr. Schneider's "step two" and "step three" opinions were persuasive. *Id.* at 23. But the ALJ rejected the contention that Dr. Schneider's opinion would "result in an RFC finding that precludes one or more of the basic work-related mental abilities," and thus endorse "a reduction to sheltered, non-[substantial gainful activity] work and an inability to perform any competitive work, whether it be skilled or unskilled," *id.* at 23–24. The ALJ pointed out that Dr. Schneider did not equate flexible hours to "sheltered, non-SGA work," *id.* at 24; *compare id.* at 95 (Dr. Schneider's flexible hours recommendation), *with id.* at 344 (Daniel's portrayal of that recommendation to the ALJ), and that "the longitudinal record is more consistent with a better RFC," *id.* at 24. Specifically, the ALJ relied on evidence of Daniel's history of skilled work and the actual return to skilled work; his objectively normal examination signs in areas such as alertness, attention, and memory; objectively normal examination signs in areas like mood, affect, behavior, and thought processes; evidence of improvement; and Daniel's non-work activities in public. *Id.* at 24; *see id.* at 20–22 (discussing the above factors). That is more than

substantial evidence to support a finding that Daniel could perform a job with end-of-day work goals (but not fast-paced production work).

***Interaction with others.*** The ALJ's finding that Daniel had the residual functional capacity to respond appropriately to supervision and occasionally interact with co-workers and the general public is also supported by substantial evidence. Many of Daniel's non-work activities between March 2021 and December 2022, such as playing golf and going on job interviews, involved public and variable environments, during which he would have encountered and interacted with other people. AR1 at 22. The ALJ also concluded that Daniel had a greater capacity for interaction because there was evidence of improvement in the record, and that his examination results in areas like mood, affect, and behavior were normal. *Id.* at 24. So the ALJ built a "logical bridge" between the evidence and the conclusion. *Beardsley v. Colvin*, 758 F.3d 834, 835 (7th Cir. 2014).

***Low-pressure work environment.*** Daniel contends that the ALJ did not try to determine what limits were necessary to account for his stress and ensure a low-stress or low-pressure work environment. Pl.'s Br. at 5. Despite the fact that the ALJ *did* limit Daniel to no fast-paced production work or work with strict production quotas, AR1 at 18, Daniel argues that the ALJ did not explain whether those limits addressed Dr. Schneider's opinion that Daniel required time and flexibility to complete job tasks. Pl.'s Br. at 5. Daniel also asserts that the ALJ did not identify evidence that he could work faster at times to achieve end-of-day goals. *Id.*

Those criticisms miss the mark. At the hearing, the ALJ clarified that her understanding of the limit at issue—no fast-paced production work and no strict production quotas, but end-of-day goals were permitted—was that "there isn't that strict or stringent production or very fast production rate as part of the work," and *not* that an "individual sits there and doesn't work until the last hour just to catch up." AR1 at 67. And the ALJ relied on test results demonstrating that Daniel had normal memory and attention levels. *Id.* at 21. The ALJ noted that though Daniel reported subjective attention and memory problems, he was "nonetheless able to complete and persist at mental testing, and objectively unremarkable in areas like thought processes, appearances, alertness, memory, … and behavior." *Id.* The ALJ observed that Daniel showed "normal cognitive ability," memory, and attention, even without regular counseling. *Id.* at 21–22. The ALJ also found that Daniel's ability to participate in non-work activities, like golf and driving a car for hours, was "more consistent with a reduction to simpler tasks than with the allegations about a dramatic drop from skilled to debilitating functioning" by the alleged onset date. *Id.* at 22. The ALJ also discussed Daniel's longer history of disability and work, that is, his medical records show that he has dealt with depression for several decades, and yet he has also worked in complex and mentally demanding IT jobs during that time. *Id.* And the ALJ took particular note of the evidence that Daniel resumed performing similar IT work in December 2022—which he has reportedly been able to sustain—even though he reported during the hearing that he still suffers from mental impairment. *Id.* So

the ALJ has adequately explained why she did not adopt Dr. Schneider's opinion in its entirety.

Finally, Daniel argues that the record demonstrates that his test results showed that he was below average in understanding, retaining, and carrying out verbal instructions; he had slow and hesitant speech; his learning was in the borderline range; and that he had a delayed recall in the low average range. Pl.'s Br. at 7–8; *see also* AR1 at 549, 578, 920. But "[t]he court's role is not to reweigh evidence, but to determine whether the ALJ built an accurate and logical bridge between the evidence and the conclusion." *Peeters v. Saul*, 975 F.3d 639, 641 (7th Cir. 2020) (cleaned up). Here, the ALJ established a logical connection between the evidence and the conclusion after a review of the record as a whole. *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017). The Court declines to (and in fact is not permitted by law to) reassess *de novo* the weight that the ALJ assigned certain test results.

**B. Dr. Soble**

Next, Daniel contends that the ALJ's analysis of the opinions of the neuropsychological examiner, Dr. Soble, was not supported by substantial evidence. Pl.'s Br. at 9. Soble conducted a neuropsychological evaluation for Daniel in October 2021, during which the doctor found that Daniel showed functional language and visuospatial/constructional abilities, as well as intact attention/working memory, processing speed, and executive functioning capabilities. AR1 at 546, 549. In the "Recommendations" portion of the examination report, Dr. Soble opined that "[i]f [Daniel] returns to previous employment or a new position, he is eligible for accommodations through

the Americans with Disabilities Act (ADA)," such as "extended time for job-related tasks," "negotiating different work hours," and "request[ing] daily tasks to be written down by creating to-do lists." *Id.* at 550.

In the findings, the ALJ concluded that "the opinion-like suggestions" on Daniel's eligibility for accommodations in Dr. Soble's neuropsychiatric examination were unpersuasive. AR1 at 24. Daniel argues that the ALJ failed to build a logical bridge between Dr. Soble's statement and the ALJ's conclusion that Dr. Soble's opinions were not persuasive. Pl.'s Br. at 12. The government responds that the ALJ reasonably questioned the precise nature of Dr. Soble's statements about ADA accommodations, and even if his statements were a medical opinion that had to be assessed under 20 C.F.R. § 404.1520c, the ALJ sufficiently explained why she found Dr. Soble's statements to be unpersuasive. Def.'s Mot. at 9–10.

Under current regulations, a medical opinion is "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" that affects the "ability to perform mental demands of work activities." 20 C.F.R. § 404.1513(a)(2)(ii); *see Jones v. Dudek*, 134 F.4th 991, 993 (7th Cir. 2025). The government argues that Dr. Soble's comments about Daniel's eligibility for ADA accommodations were "suggestions as to how [Daniel] could best do his work if he returned to working," not "what he believed [Daniel] could still do despite his impairments," nor did Dr. Soble "identify specific functional restrictions." Def.'s Mot. at 9. The Court agrees. Dr. Soble's comments about potential ADA accommodations that Daniel could request if he returned

to work were not statements about what the doctor believed Daniel could *still* do despite his impairments or an identification of specific functional restrictions.

Setting that aside, even if Dr. Soble's comments were a medical opinion, an ALJ is only required to "provide an explanation for how the evidence leads to their conclusions that is sufficient to allow … a reviewing court[] to assess the validity of the agency's ultimate findings and afford the appellant meaningful judicial review." *Warnell v. O'Malley*, 97 F.4th 1050, 1054 (7th Cir. 2024) (cleaned up). The ALJ has done that here. The ALJ acknowledged throughout the decision that some of Daniel's neuropsychiatric test results "showed evidence of low or below average scores in portions of standardized intellect testing like delayed recall," AR1 at 17, 21, but ultimately gave more weight to Daniel's "unremarkable" test results. *See* AR1 at 17 ("However, the claimant had average or 'superior' scores in other portions of the testing … and his medical sources more commonly reported normal or unremarkable memory, intellect, and judg[ment] signs."); *id.* at 20 (observing that Dr. Soble's opinion that Daniel did not have a true neurocognitive disorder and instead was experiencing cognition-affecting symptoms caused by depression, anxiety, and situational stress "was further supported by ancillary factors like normal brain imaging study results"); *id.* at 21 (noting normal test results in areas such as behavior, mood, attention, concentration, and memory). *See Zellweger v. Saul*, 984 F.3d 1251, 1252 (7th Cir. 2021) (holding that a reviewing court is allowed to read an ALJ's decision holistically). So the ALJ adequately explained why the record was more consistent with the findings, and why the ALJ found Dr. Soble's opinion on ADA accommodations to

be unpersuasive in light of Daniel's highly skilled work activity and normal test results.

## IV. Conclusion

Daniel's summary judgment motion, R. 16, is denied and the government's cross-motion for summary judgment, R. 19, is granted. The Court affirms the Commissioner's decision.

As noted earlier in the Opinion, the Plaintiff must file a motion to maintain pseudonym by October 14, 2026, explaining why the Opinion should not be amended to include his full name.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 29, 2026